Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>ERICK YAMIL PÉREZ PÉREZ<br><br>Recurrido | TA2026CE00793 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de Arecibo<br><br>Caso núm.:<br>C SC2025G0403<br><br>Por: Art. 401 SC |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pérez Ocasio y la Jueza Trigo Ferraiuoli.

Sánchez Ramos, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2026.

Luego de una vista evidenciaria, el Tribunal de Primera Instancia ("TPI") suprimió cierta evidencia ocupada sin una orden judicial previa. Según se explica en detalle a continuación, concluimos que erró el TPI debido a que, como cuestión de derecho, y de conformidad con la prueba que el TPI manifestó haber creído, dicha evidencia fue producto de unos registros incidentales a unos arrestos válidos en ocasión de observaciones en un lugar público, las cuales brindaron motivos fundados para creer que el imputado, y otra persona a quien se le ocupó evidencia en controversia, estaban cometiendo el delito de posesión y distribución de sustancias controladas.

I.

Por hechos ocurridos el 23 de septiembre de 2025, el Ministerio Público denunció y, luego del trámite correspondiente, acusó, al Sr. Erick Y. Pérez Pérez (el "Imputado") de violación al Artículo 401 de la Ley de Sustancias Controladas, 24 LPRA sec. 2401 (posesión de sustancias controladas con intención de

distribución). En síntesis, se le imputó que, en común y mutuo acuerdo con los Sres. Yamil Avilés Ferrer (el "Tirador") y Michael Shamil Santos Domínguez (el "Otro Runner"), "poseían con intención de distribuir ... marihuana ... [c]onsistente de 36 bolsitas plásticas transparentes, con cierre presión, conteniendo picadura de marihuana, y 10 envases cilíndricos transparentes conteniendo ... picadura de marihuana".

El 1 de abril de 2026, el Imputado instó una moción de supresión de evidencia (la "Moción"). Arguyó que "la evidencia que [se] pretende utilizar en [su] contra ... fue incautada sin una orden de registro", por lo cual se presume que dicho registro fue irrazonable. Solicitó una vista para que el Estado demostrara la razonabilidad del registro. Planteó que, durante la vista preliminar, los testimonios de los agentes de la Policía fueron estereotipados, contradictorios, vagos y vacíos.

El 6 de abril, el Ministerio Público se opuso a la Moción. Sostuvo que de los testimonios de los agentes surgían suficientes motivos fundados para el arresto y registro. En particular, afirmó que los motivos fundados para la intervención cuestionada se desprenden de las propias acciones del Imputado, según fueron observadas por el Agte. Carlos A. Pérez Torres (el "Agente") durante la vigilancia que este realizó. En específico, el Agente observó con sus binoculares que el Imputado le entregó una bolsa transparente con marihuana al Tirador. El Ministerio Público explicó que el Agente le comunicó al Sgto. Manuel Quiñones Sánchez (el "Sargento") las descripciones del Imputado y del Tirador y que, a raíz de dichas observaciones, ambos individuos fueron inmediatamente arrestados y registrados por otros agentes (Agtes. Pérez Rivera y Rivera Ríos).

El 14 de abril de 2026 el TPI celebró la vista de supresión de evidencia y, mediante una Resolución notificada el 20 de abril,

declaró con lugar la Moción (el "Dictamen"). Según la regrabación del proceso, el TPI consignó que los testimonios de los agentes le merecieron credibilidad; no obstante, aseveró que no tenía manera de saber si la sustancia ocupada era la misma que observó el Agente. El TPI añadió que no se desfiló prueba de que el Imputado realizara alguna venta de una sustancia controlada. Además, afirmó que no tenía manera de vincular el dinero ocupado al Imputado con un acto delictivo.

El 24 de abril, el Ministerio Público solicitó la reconsideración del Dictamen. Señaló que la sustancia cuya supresión se solicitó "fue ocupada como parte de un registro realizado a una tercera persona" (el Tirador). Por tanto, arguyó que, como el Imputado "no fue la persona agraviada" por el registro, carece de legitimación activa para solicitar la supresión de dicha evidencia.

El Imputado se opuso a la moción de reconsideración. Planteó que fue a través de dicha moción que el Ministerio Público planteó por primera vez lo relacionado con la ausencia de legitimación activa del Imputado. Además, arguyó que este planteamiento era "incompatible con la propia teoría acusatoria" porque, "o el acusado tenía control y posesión de la sustancia ocupada o no la tenía".

Mediante una Resolución notificada el 20 de mayo, el TPI denegó la referida moción de reconsideración.

En desacuerdo, el 22 de junio[1], el Procurador General presentó el recurso que nos ocupa. Resaltó que el Agente, mediante una vigilancia desde un lugar público, vio al Imputado "entregándole una bolsa transparente con marihuana al vendedor de sustancias controladas", a raíz de lo cual ambas personas fueron arrestadas y registradas. Señaló que dicho testimonio fue creído por el TPI, según lo consignado explícitamente por dicho foro. Por tanto, arguyó, en

---

[1] El 22 de junio (lunes) fue el primer día laborable en el Poder Judicial luego del 18 de junio (jueves).

primer lugar, que el Imputado carecía de legitimación activa para solicitar la evidencia ocupada al Tirador y, en segundo lugar, que, "ante la presencia de material delictivo a plena vista", fueron válidos los registros al Tirador y al Imputado, los cuales se realizaron de forma incidental al arresto de cada uno.  El recurso se acompañó con copia de la regrabación de la vista de supresión de evidencia[2].

Mediante una Resolución emitida y notificada el **23 de junio**, le ordenamos al Imputado mostrar causa, en o antes del 29 de junio (lunes), por la cual no debíamos expedir el auto de *certiorari* y revocar la determinación recurrida.

En la noche del último día del término concedido, **29 de junio, a las 6:39pm**, el Imputado solicitó la extensión del término concedido.  Hemos determinado denegar la referida solicitud, pues la misma se presentó fuera del término reglamentario aplicable. Véase Regla 72(B) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R.72.  La razón provista para justificar la prórroga (que no se le había notificado la regrabación de la vista) era conocida por el Imputado desde la presentación del recurso, pero el Imputado esperó al último día del término para plantearnos el asunto.  Así pues, el Imputado no consignó razón alguna por la cual no habría podido presentar la moción de prórroga oportunamente, o al menos haber solicitado al Procurador General que le notificara la regrabación[3].   En cualquier caso, el asunto planteado por el Imputado no le impedía cumplir oportunamente con lo ordenado. Adviértase que la abogada del Imputado ante este Tribunal es también quien representó al Imputado, y estuvo presente, durante

---

[2] Ello de forma física, junto con una moción de autorización para usar la regrabación como método de reproducción de la prueba.  Declaramos con lugar dicha moción.

[3] A la mañana siguiente de presentada la moción de prórroga, el Procurador General informó haber enviado copia de la regrabación al Imputado, a través del correo electrónico de su abogada.

la vista, por lo cual conoce lo allí ocurrido y estaba en posición de presentar su postura en el tiempo ordenado.

II.

Luego de escuchar cuidadosamente la regrabación de la vista evidenciaria, exponemos a continuación un resumen de la prueba que allí desfiló.

### A. El Agente

Las cualificaciones del Agente fueron estipuladas.[4]  Declaró que, el 23 de septiembre de 2025, "tomó servicio" a las 8:00 a.m. en la División de Drogas de Arecibo bajo la supervisión del Sargento.[5] Explicó que por la mañana se discutió un plan de trabajo dirigido a realizar en horas de la tarde -- "una vigilancia, arresto y corroboración" en los diferentes puntos de droga que comprenden el área de Arecibo.[6]

En específico, recibió instrucciones del Sargento en cuanto a que sería el "vigilante" de la operación dirigida y desarrollada en el Residencial Los Murales (el "Residencial") en el pueblo de Manatí.[7] Una vez recibe las instrucciones, el Agente declaró que se le asignó un vehículo confidencial con tintes que contenía su equipo reglamentario, incluidos unos binoculares de su propiedad. Además, indicó que se puso a la disposición del personal que estaría pendiente de él, debido a que estaría solo en el Residencial prestando la vigilancia dentro del vehículo.[8]

Relató que alrededor de las 3:50 p.m. condujo el auto confidencial desde la División de Drogas y a eso de las 4:00 p.m. entró al Residencial.[9]  Luego, utilizó la radiofrecuencia asignada por la Policía de Puerto Rico y le informó a todo el personal asignado a

---

[4] Regrabación de la Vista de Supresión de Evidencia de 14 de abril de 2026 (la "Regrabación"), 8:09.
[5] *Íd.*, 8:18 - 8:29.
[6] *Íd.*, 8:35 - 8:44.
[7] *Íd.*, 8:51 - 9:04.
[8] *Íd.*, 9:08 – 9:33.
[9] *Íd.*, 9:48 – 9:58.

vigilar por su seguridad que ya estaba dentro del Residencial y todos le confirmaron y le copiaron que estaban todos pendientes a su seguridad.[10]

Explicó que se ubicó en un lugar estratégico, desde el cual tenía visibilidad hacia el lugar donde, debido a intervenciones anteriores, describe como de alta incidencia criminal, incluida la venta, bastante frecuente, de sustancias controladas.[11] Después, le comunicó al Sargento que ya estaba ubicado en un lugar bastante claro[12], y que se encontraba cómodo y pendiente a todos los ángulos.[13]

Observó las ventas que realizaba un individuo que se encontraba cerca de la cancha bajo techo.[14] Luego describió el área bajo observación: frente a la cancha bajo techo está la administración, hay unas escaleras y el edificio 9, una acera peatonal y un contenedor de basura.[15] En específico, si se mira de frente a la cancha, el Agente indicó que hay unas escaleras, a la derecha está la administración y a la izquierda el edificio 9.[16] Detalló que se estacionó en el estacionamiento donde podía ver la parte posterior del Residencial donde ubican los edificios número 10 y 13.[17] Añadió que en ese lugar hay un área peatonal, hay un portón peatonal en la parte posterior y, si miraba de frente, podía ver la parte posterior; si miraba a la derecha, tenía visibilidad al área peatonal, el contenedor, la administración, las escaleras, y a su mano derecha se encontraba la escalera.[18] Subsiguientemente, notificó al Sargento que comenzaría las observaciones.[19]

---

[10] *Íd.*, 10:00 - 10:11.
[11] *Íd.*, 10:17 - 10:36.
[12] *Íd.*, 10:38 - 10:46.
[13] *Íd.*, 10:42 – 10:52.
[14] *Íd.*, 10:58 - 11:02.
[15] *Íd.*, 11:04 - 11:12.
[16] *Íd.*, 11:18 – 11:29.
[17] *Íd.*, 11:45 - 11:52.
[18] *Íd.*, 11:53 - 12:08.
[19] *Íd.*, 12:17 - 12:23.

Entonces indicó que llegó un individuo, con una camiseta roja, descrito como un usuario, del área de la cancha, cruza la carretera y llega hasta donde se encuentra un individuo detenido en el área de las escaleras con camisa negra, pelo corto negro, tez blanca, joven, de estatura promedio y vestido con pantalón negro, tenis negros y medias blancas (el Tirador).[20] El Agente indicó que el usuario de camisa roja comienza a conversar con el joven y le entrega dinero en papel moneda.[21] El otro individuo tomó el dinero y caminó hacia el contenedor de basura, en donde se dobló y de debajo del contenedor sacó una caja plástica y transparente de aproximadamente un pie con tapa y cierre.[22] Mediante los binoculares, el Agente observó que la caja tenía divisiones en su interior y aseveró que, a este tipo de caja, se le conoce comúnmente como una caja de pescar.[23] Narró que el individuo vestido de negro abrió la caja plástica y le entregó al usuario varias bolsas transparentes con un polvo blanco, que por su experiencia como agente investigador de drogas, describió como cocaína.[24] El comprador caminó hacia la cancha y luego el testigo lo pierde de vista.[25] El Agente declaró que informó por radio la compra realizada y que le informó al Sargento las descripciones exactas del individuo que estaba realizando las ventas de sustancias controladas en ese lugar.[26] No obstante, se le informó por radio que no se pudo realizar el arresto del usuario porque que este se mantuvo dentro del Residencial.[27]

Continuada la vigilancia, el Agente declaró que alrededor de las 4:20 pm llegó un individuo, vestido con una camiseta negra y un

---

[20] *Íd.*, 12:28 – 12:55.
[21] *Íd.*, 12:57 – 13:10.
[22] *Íd.*, 13:11 – 13:43.
[23] *Íd.*, 13:44 - 13:51.
[24] *Íd.*, 13:56 - 14:14.
[25] *Íd.*, 14:15 - 14:21.
[26] *Íd.*, 14:20 - 14:34.
[27] *Íd.*, 14:52 - 14:59.

pantalón rojo corto, bigote, "chiva" y el pelo abultado, con un bolso azul de tela, grande y que se veía pesado (el Otro Runner).[28] Este se acercó al Tirador y ambos individuos comenzaron a conversar.[29] Luego, observó que ambos individuos se sentaron en las escaleras para realizar el cuadre de las ventas del punto de drogas.[30] Una vez contado el dinero, el Agente indicó que el caballero de camisa negra y pantalón rojo se quedó con parte del dinero y lo colocó en la bolsa azul.[31] Luego, el Agente refirió que le informó por radio al Sargento las descripciones de ambos individuos: el Tirador y el que ayudó a este a realizar el cuadre de las ventas.[32]

Continuado su testimonio, el Agente declaró que entre 4:20 y 4:25 pm el individuo de la camisa negra y pantalón rojo le entregó al Tirador un paquete que contenía diferentes sustancias controladas (de diferentes colores y tamaños), y que este último guardó el paquete dentro de la caja transparente y procedió a colocarla debajo del contenedor de basura.[33] Añadió que el individuo que tenía bigote y "chiva", que tenía el bolso azul, se levantó, caminó hasta la parte posterior del residencial y llegó al portón peatonal ubicado entre los edificios 10 y 13.[34]

El Agente le indicó al Sargento la salida del individuo para que lo arrestaran.[35] Detalló que el individuo se montó por el lado del chofer en una Jeep Cherokee color azul con tintes y emprende la marcha saliendo del Residencial y que, al cabo de varios minutos, escuchó por radio que el individuo fue arrestado en compañía de una dama, por el Agte. Alex Martínez Espada en el estacionamiento de "China Town".[36] Declaró que, durante el arresto, el agente

---

[28] *Íd.*, 15:29 – 15:52.
[29] *Íd.*, 16:03 – 16:11.
[30] *Íd.*, 16:23 – 16:40.
[31] *Íd.*, 16:42 - 16:51.
[32] *Íd.*, 16:52 – 17:06.
[33] *Íd.*, 17:10-17:33.
[34] *Íd.*, 17:35 – 17:52.
[35] *Íd.*, 17:53 – 17:58.
[36] *Íd.*, 17:58 - 18:24.

Martínez Espada informó por radio que se ocuparon sustancias controladas y bastante dinero dentro de la bolsa azul.[37]

El Agente declaró que alrededor de las 4:50 pm llegó caminando desde el interior del Residencial otro individuo de tez blanca, camisa blanca y azul, mahón largo que le entregó al Tirador varios billetes de papel.[38] El Tirador buscó la caja transparente debajo del contenedor de basura y le entrega varias bolsas transparentes con cierre a presión que el Agente identificó como cocaína.[39] El comprador salió del área a toda prisa y el Agente lo pierde de vista.[40] Se le informó por radio que este comprador había entrado a un apartamento, por lo cual no se realizó el arresto.[41] El Agente observó otra transacción y ofreció los detalles por radio de lo observado.

Subsiguientemente, alrededor de las 5:30 – 5:35 pm, el Agente observó a un caballero de tez blanca y cabello negro, caminando por la acera peatonal entre los edificios 10 y 13, vestido con una camisa negra, un pantalón corto de color negro desgastado y chancletas grises, que tenía en su mano derecha una bolsa grande, transparente con cierre a presión.[42] Relató que dicha bolsa contenía unos cilindros transparentes plásticos con tapas blancas y bolsas pequeñas de cierre a presión que contenían una sustancia color verde que, según la experiencia del Agente, aparentaba ser marihuana.[43]

El Agente identificó en sala al Imputado como el caballero que tenía la bolsa de marihuana.[44] Declaró que observó al Imputado caminar por la acera peatonal a toda prisa entre los edificios 10 y

---

[37] *Íd.*, 18:31 – 18:35.
[38] *Íd.*, 19:00- 19:27.
[39] *Íd.*, 19:28 – 19:41.
[40] *Íd.*, 19:42 – 19:46.
[41] *Íd.*, 19:47 – 19:59.
[42] *Íd.*, 22:20 - 23:00.
[43] *Íd.*, 23:24 – 23:49.
[44] *Íd.*, 23:51 – 24:03.

hasta llegar a donde se encuentra el Tirador realizando las ventas de sustancias controladas.[45]  Los individuos conversan entre sí y el **Agente observó cuando el Imputado le entregó al Tirador la bolsa con marihuana en su interior**.[46]  Este sacó la caja transparente que estaba debajo del contenedor de basura y ambos caminaron hacia las escaleras donde se sentaron.[47]  Ambos individuos comienzan a contar el dinero que el Tirador sacó de su bolsillo.[48]

Alrededor de las 5:40 pm, el Agente informó al Sargento por radio la descripción de ambos individuos y el Sargento le indicó que se procedería a entrar al Residencial a realizar los arrestos.[49]  El Agente declaró que alrededor de las 5:50 pm escuchó y observó que llegaron varios vehículos al área vigilada.[50]  En particular, detalló que el Imputado fue arrestado por el Agte. Felo Pérez Rivera, mientras que el Agte. Omar Rivera Ríos arrestó al Tirador.[51]  Luego escuchó al Sargento y al agente Omar Rivera manifestar que habían ocupado bastante cantidad de drogas y bastante dinero.[52]  Añadió que al Imputado le ocuparon **dinero en los bolsillos**.[53]

Culminados los arrestos, el Agente, por instrucciones del Sargento, salió del Residencial y fue hasta la División de Drogas de la Región de Arecibo, ubicada en el Municipio de Manatí.[54]  Una vez allí, se reunió con los agentes en el área del salón de conferencias en donde se realizaba el "display" (la muestra del material y el dinero incautados) e identifica, a cada uno de los compañeros agentes, el rol de cada uno de los individuos arrestados.[55] Detalló que al agente

---

[45] *Íd.*, 23:04- 24:22.
[46] *Íd.*, 24:04-24:52 y 26:37 – 26:42.
[47] *Íd.*, 24:53 – 25:11.
[48] *Íd.*, 25:12 – 25:19.
[49] *Íd.*, 25:43 - 25:47 y 26:56 - 27:06.
[50] *Íd.*, 27:20 – 27:39.
[51] *Íd.*, 27:50- 28:01.
[52] *Íd.*, 28:10 – 28:22.
[53] *Íd.*, 28:23 - 28:25.
[54] *Íd.*, 28:32 – 28:48.
[55] *Íd.*, 28:43 – 29:03.

Felo Pérez le indicó que el Imputado fue quien le entregó la bolsa transparente con marihuana al Tirador.[56] **Añadió que el agente Felo Pérez le dijo que le ocupo bastante dinero en los bolsillos al Imputado**.[57]

El Agente también declaró que el agente Omar Rivera le expresó que había arrestado al individuo que estaba haciendo las ventas (el Tirador), identificado como Yamil.[58] Luego habló con el agente Alex Martínez, a quien le identificó el caballero que había realizado "el cuadre" cuando comenzaba la vigilancia, quien fue arrestado con su pareja y se le ocupó el bolso color azul y sustancias controladas (el Otro Runner).[59] En cuanto al agente Nelson Cordero, este le informó que no se pudo arrestar al individuo que usaba una bicicleta con zapatos color rosa.[60]

En cuanto al método de preservación de la evidencia incautada, el Agente explicó que se hizo una prueba de campo a todo el material ocupado, y que el dinero incautado fue ocupado por instrucción de la Fiscal. Especificó que la caja transparente se guardó en el cuarto de evidencia y las sustancias controladas se enviaron a Ciencias Forenses para identificación.[61]

En cuanto al momento del arresto, el Agente declaró que el Imputado estaba cerca del Tirador, que estaban juntos.[62] Luego, explicó como el material ocupado es sellado al vacío.[63] En cuanto a la prueba de campo, esta se coloca en un sobre de Ciencias Forenses y es sellado.[64]

Al mostrársele la fotografía identificada como el Exhibit 2.1 del Ministerio Público, el Agente describió la foto a color que capta

---

[56] *Íd.*, 29:08 - 29:20.
[57] *Íd.*, 29:23 – 29:26.
[58] *Íd.*, 29:29 – 29:43.
[59] *Íd.*, 29:45 – 30:00.
[60] *Íd.*, 30:05 – 30:11.
[61] *Íd.*, 31:04 – 31:25.
[62] *Íd.*, 33:18 - 33:30.
[63] *Íd.*, 33:53 – 34:04.
[64] *Íd.*, 34:05 - 34:09.

varios cilindros transparentes con tapas blancas, las mismas que fueron observadas durante su vigilancia y bolsas transparentes con cierre a presión que contienen una sustancia color verde que aparenta ser marihuana.[65] Explicó que la foto corresponde a lo que se encontraba en el interior de la bolsa transparente que el Imputado le entregó al Tirador al momento de la vigilancia.[66] En cuanto al Exhibit 2.2 del Ministerio Público, el Agente la describió como una foto de papel moneda en diferentes denominaciones, que según el agente Felo Pérez corresponde al dinero que el ocuparon al Imputado en el bolsillo.[67]

La defensa arguyó que lo ocupado al Tirador y al Otro Runner no tiene que ver nada con el Imputado, a lo que el TPI expresó que tomaría conocimiento de lo que se haya ocupado a todos los demás y que el Agente lo que declaró es que lo que se le ocupó al Imputado fue un dinero. [68]

En el contrainterrogatorio, el Agente admitió que no se arrestó a ninguno de los compradores que observó durante su vigilancia.[69] Reconoció que no vio al Imputado hablar con otro de los arrestados, Michael (el otro Runner), a pesar de que en la denuncia se indicó que actuaron en concierto y común acuerdo.[70] Negó que en la vista de Regla 6 no dijo que vio al Imputado con la bolsa transparente cerca de la cadera.[71] Aseveró que no sabía si la bolsa que el Imputado le entregó al Tirador se encontró dentro de la caja transparente.[72] También, admitió que no vio si esa bolsa transparente la echaron a un zafacón, la botaran, la metieran en un bolsillo, la tiraran para un lado.[73] Reconoció que al Imputado

---

[65] *Íd.*, 37:45 – 38:06.
[66] *Íd.*, 38:20 – 38:46.
[67] *Íd.*, 38:52 – 39:12.
[68] *Íd.*, 32:29 – 32:35.
[69] *Íd.*, 40:40 - 40:56.
[70] *Íd.*, 41:03 – 41:20.
[71] *Íd.*, 41:28 – 43:13.
[72] *Íd.*, 43:50 – 45:20.
[73] *Íd.*, 45:35 – 45:55.

únicamente le ocuparon dinero e insistió que el Exhibit 2.2 (foto del dinero incautado) corresponde y concuerda con el dinero que se le ocupó a este.[74] Admitió que quien ocupó el dinero fue el agente Felo Pérez.[75] El Agente indicó que desconocía que al Imputado y al Tirador se le ocupó igual cantidad de dinero.[76] Admitió que toda la droga ocupada estaba en la caja de pescar y no se encontró una bolsa *ziploc* (sic).[77] Negó que lo único que observó del Imputado es que hablaba con el Tirador.[78] Aseveró que puede ser un delito poseer dinero en efectivo, según la procedencia de ese dinero.[79] Expresó desconocer si el Imputado trabajó con su mamá el día de la vigilancia y por eso tenía dinero en efectivo.[80] Reconoció que la bolsa transparente que contenía marihuana no fue incautada y que fue quien único la vio.[81]

En el redirecto, el Agente aclaró que no vio al Otro Runner (Michael) y al Imputado juntos durante el periodo de la vigilancia debido a que estos no coincidieron.[82] Clarificó que "Michael" fue arrestado por el agente Martínez Espada.[83] Reiteró que a quien vio con el Imputado fue a Yamil (el Tirador).[84] Enfatizó que, al momento de la vigilancia, aproximadamente a las 5:35 pm, fue cuando observó al Imputado caminar desde la parte posterior del Residencial, mientras que el arresto ocurrió entre 10-15 minutos después, a las 5:50 pm.[85] **Destacó que pudo identificar que la marihuana incautada que vio en el cuartel fue la que le vio al Imputado debido a que esta se encontraba en los mismos**

---

[74] *Íd.*, 46:05 – 48:30.
[75] *Íd.*, 48:33 – 48.36.
[76] *Íd.*, 52:42 - 52:53.
[77] *Íd.*, 54:00 - 54:12.
[78] *Íd.*, 55:04 – 55:13.
[79] *Íd.*, 55:20 – 55:35.
[80] *Íd.*, 55:39 – 55:43.
[81] *Íd.*, 55:44 – 55:47.
[82] *Íd.*, 56:16 – 56:27.
[83] *Íd.*, 56:30 – 56:34.
[84] *Íd.*, 56:38 - 56:40.
[85] *Íd.*, 57:12 – 57:42.

**envases cilíndricos con tapas blancas.**[86] Distinguió que el resto de la droga ocupada dentro de la caja transparente era cocaína, crack y heroína.[87]

B. Agente Felo Pérez Rivera

Luego de que se estipulara su capacidad, declaró que, el 23 de septiembre de 2025, tomó servicio a las 8:00 am y con el Sargento se discutió un plan de vigilancia y arresto en el Residencial.[88] También se le informó que el Agente era el asignado a prestar la vigilancia. Por su parte, el agente Pérez Rivera indicó fue asignado a otro vehículo confidencial no rotulado en compañía del Agte. Omar Rivera Ríos, el agente Román y el Sargento.[89]

Una vez ubicado en un lugar estratégico, expuso que alrededor de las 5:35 pm recibieron del Agente la descripción de dos individuos: ambos con camiseta negra y pantalones cortos, pero uno tenía el pelo afro y el pantalón desgastado.[90] Declaró que se le indicó que este último llegó al Residencial y le entregó una bolsa transparente de cierre a presión que contenía varios envases cilíndricos con tapas blancas con aparente marihuana y bolsas verdes.[91] Luego identificó a dicho individuo como el Imputado que en ese momento se encontraba en la vista.[92]

Alrededor de las 5:40 pm, el Agente hizo gestiones con el Sargento para que se arrestaran las personas que observó distribuir sustancias controladas.[93] Relató que a eso de las 5:50 pm ingresó, junto a sus compañeros, al Residencial al área cerca de un contenedor de basura y unas escaleras donde estaban dos

---

[86] *Íd.*, 58:21 – 59:04.
[87] *Íd.*, 59:08 – 1:00:01.
[88] *Íd.*, 1:01:57 – 1:02:09.
[89] *Íd.*, 1:02:10 – 1:02:24.
[90] *Íd.*, 1:02:34 – 1:02:50.
[91] *Íd.*, 1:02:51 – 1:03:10.
[92] *Íd.*, 1:03:13 – 1:03:19.
[93] *Íd.*, 1:03:20 – 1:03:36.

individuos con las descripciones que previamente ofreció el Agente.[94]

Luego se identificó como policía al Imputado, lo arrestó y le dijo las advertencias de ley.[95]  Por razones de seguridad, lo registró y le ocupó una cantidad de dinero, indeterminada en ese momento.[96]  Una vez en la división de drogas, el Agente le identificó al caballero que arrestó como el Imputado y quien observó entregarle sustancias controladas al Tirador.[97]  Luego contabilizó el dinero que resultó en un total de $342.[98]

Enfatizó que al momento del arresto el Imputado estaba sentado con el Tirador en las escaleras "uno al lado del otro" y no había más nadie con ellos.[99]  Explicó que al Tirador lo arrestó el Agte. Omar Rivera Ríos.[100]  En cuanto a las sustancias controladas ocupadas durante el operativo, una vez en la División, observó una caja plástica transparente con envases cilíndricos de tapa blanca con picadura de marihuana en su interior, más otro tipo de sustancias que no pudo precisar.[101]

En el contrainterrogatorio, el agente Pérez Rivera admitió que, cuando hizo la prueba de campo, no vio una bolsa con cierre de presión (Ziploc).  Tampoco ocupó una bolsa de cierre a presión cuando arrestó al Imputado.[102]

### C. Agte. Omar Rivera Ríos

En el directo, también se estipuló la capacidad del agente Rivera Ríos.  A preguntas del TPI, narró que, el 23 de septiembre de 2025, una vez se arrestó al Tirador, se le ocupó una caja transparente que contenía marihuana, crack y cocaína.[103]  Una vez

---

[94] *Íd.*, 1:03:37 – 1:03:49.
[95] *Íd.*, 1:03:50 – 1:04:02.
[96] *Íd.*, 1:04:09 – 1:04:19.
[97] *Íd.*, 1:04:20 – 1:04:31.
[98] *Íd.*, 1:04:33 – 1:04:39.
[99] *Íd.*, 1:05:03 – 1:05:13.
[100] *Íd.*, 1:05:21 – 1:05:32.
[101] *Íd.*, 1:06:37 - 1:06:54.
[102] *Íd.*, 1:07:00 – 1:07:20.
[103] *Íd.*, 1:10:20 – 1:10:40.

en la División, se abrió la aludida caja transparente y, en su interior, había marihuana, cocaína y heroína. Luego de la prueba de campo, se confirmó que también había fentanilo.[104] Al Tirador se le ocuparon $431.[105] Reiteró que en la cajita había entre 35 y 36 capsulas de marihuana.[106]

En el contrainterrogatorio, el agente Rivera Ríos admitió que no vio una bolsa *Ziploc* (sic) en la caja transparente y que tampoco la ocupó u observó durante su intervención.[107]

### III.

La protección contra registros, incautaciones y allanamientos irrazonables es de índole constitucional. Así, el Artículo II, Sección 10, de la Constitución del Estado Libre Asociado, dispone en lo pertinente que: "[s]ólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse. Evidencia obtenida en violación a esta sección será inadmisible en los tribunales". Art. II, Sec. 10, Const. E.L.A., LPRA, Tomo I.

Esta disposición es similar a la Cuarta Enmienda de la Constitución de los Estados Unidos y tiene como objetivo esencial proteger la intimidad y dignidad del individuo frente a las actuaciones arbitrarias del Estado. Enmda. IV, Const. EE. UU., LPRA, Tomo I. Se persigue proteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias e interponer la figura de un juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión del Estado. *Pueblo v. Miranda Alvarado*, 143 DPR 356,

---

[104] *Íd.*, 1:10:48 – 1:11:08.
[105] *Íd.*, 1:11:09 – 1:11:11.
[106] *Íd.*, 1:11.15 – 1:11:29.
[107] *Íd.*, 1:1:11:54 – 1:12:16.

362-363 (1997), citando a *E.L.A. v. Coca Cola Bott. Co.*, 115 DPR 197, 207 (1984).

El mandato constitucional no se da contra todo tipo de registro, sino solo contra aquellos que son irrazonables. *Pueblo v. Valenzuela Morel,* 158 DPR 526, 537 (2003)*; Pueblo v. Camilo Meléndez,* 148 DPR 539, 551-552 (1999). Todo registro e incautación sin una orden judicial previa se presume inválido. *Miranda Alvarado,* 143 DPR a la pág. 363; *Pueblo v. Calderón Díaz,* 156 DPR 549, 560-561 (2002).

Ahora bien, no es siempre necesaria una orden judicial previa a un registro; en lo pertinente, no es necesaria cuando la evidencia está a plena vista. *Pueblo v. Rosario Igartúa,* 129 DPR 1055 (1992); *Pueblo v. Acevedo Escobar,* 112 DPR 770 (1982); *Pueblo v. Dolce,* 105 DPR 422 (1976). Para determinar si un objeto se encuentra a plena vista, y puede ser incautado sin una orden judicial previa, es preciso que estén presentes los siguientes criterios: (1) el artículo debe descubrirse por estar a plena vista y no en el curso o por razón de un registro; (2) el agente que observe la prueba debe tener derecho previo a estar en la posición desde la cual podía verse tal prueba; (3) el objeto debe descubrirse por inadvertencia, y (4) la naturaleza delictiva del objeto debe surgir de la simple observación. *Dolce,* 105 DPR a la pág. 436.

Tampoco es necesaria una orden judicial previa cuando el registro es incidental a un arresto válido. Por su parte, el concepto "motivos fundados" para arrestar, necesario para que el arresto sea válido, es sinónimo del término "causa probable" empleado en el contexto de la expedición de una orden de arresto. *Calderón Díaz,* 156 DPR a la pág. 557. La existencia de motivos fundados se determina a base de los criterios de probabilidad y razonabilidad. *Pueblo v. Ortiz Alvarado,* 135 DPR 41, 47 (1994). Lo verdaderamente importante es que el agente que efectúa un arresto y registro sin

orden judicial previa tenga, al momento de hacerlo, una base razonable, que se desprenda de la totalidad de las circunstancias, para creer que se está violando o se iba a violar la ley. *Íd.* Dicho de otra manera, para dirimir si un agente del orden público tenía motivos fundados para arrestar a un ciudadano sin una orden, "es indispensable analizar la información que le constaba a éste y el cuadro fáctico que éste tenía ante sí al momento del arresto para, entonces, determinar si esos hechos pudieron llevar a una persona prudente y razonable a creer que la persona que iba a ser arrestada había cometido, o iba a cometer, la ofensa en cuestión". *Calderón Díaz, supra.* (Énfasis suplido).

A su vez, la Regla 234 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 234, establece los fundamentos y el mecanismo procesal para solicitar la supresión de evidencia obtenida ilegalmente:

> La persona agraviada por un allanamiento o registro ilegal podrá solicitar del tribunal al cual se refiere la Regla 233 la supresión de cualquier evidencia obtenida en virtud de tal allanamiento o registro, o la devolución de la propiedad, por cualquiera de los siguientes fundamentos:
>
> (a) Que la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro.
>
> (b) Que la orden de allanamiento o registro es insuficiente de su propia faz.
>
> (c) Que la propiedad ocupada o la persona o sitio registrado no corresponde a la descripción hecha en la orden de allanamiento o registro.
>
> (d) Que no había causa probable para creer en la existencia de los fundamentos en que se basó la orden de allanamiento o registro.
>
> (e) Que la orden de allanamiento fue librada o cumplimentada ilegalmente.
>
> (f) Que es insuficiente cualquier declaración jurada que sirvió de base a la expedición de la orden de allanamiento porque lo afirmado bajo juramento en la declaración es falso, total o parcialmente.

En la moción de supresión de evidencia se deberán exponer los hechos precisos o las razones específicas que sostengan el fundamento o los fundamentos en que se basa la misma. El tribunal oirá prueba sobre cualquier cuestión de hecho necesaria para la resolución de la solicitud y celebrará una vista evidenciaria ante un magistrado distinto al que atenderá el juicio, cuando se trate de evidencia incautada mediando una orden judicial y la parte promovente demuestre que existe una controversia sustancial de hechos que haga necesario la celebración de la vista; en ausencia de tal demostración, el tribunal podrá adjudicar la moción sin vista previa utilizando como base los escritos presentados por las partes.

El tribunal vendrá obligado a celebrar una vista evidenciaria con antelación al juicio, y ante un magistrado distinto al que atenderá el juicio, cuando se trate de evidencia incautada sin previa orden judicial si en la solicitud la parte promovente aduce hechos o fundamentos que reflejan la ilegalidad o irrazonabilidad del registro, allanamiento o incautación. El Ministerio Público vendrá obligado a refutar la presunción de ilegalidad del registro o incautación y le corresponderá establecer los elementos que sustentan la excepción correspondiente al requisito de orden judicial previa.

De declararse con lugar la moción, la propiedad será devuelta, si no hubiere fundamento legal que lo impidiere, y no será admisible en evidencia en ningún juicio o vista. La moción se notificará al fiscal y se presentará cinco (5) días antes del juicio a menos que se demostrare la existencia de justa causa para no haberla presentado dentro de dicho término o que al acusado no le constaren los fundamentos para la supresión, o que la ilegalidad de la obtención de la evidencia surgiere de la prueba del fiscal. (Énfasis suplido).

IV.

Concluimos que erró el TPI al suprimir la evidencia objeto de la Moción pues, según la prueba creída por el TPI[108], los registros al Tirador y al Imputado son válidos, al ser incidentales a unos arrestos realizados con motivos fundados en las observaciones del Agente[109]. Adviértase que, según arriba relatado, el Tirador poseía y distribuía

---

[108] El TPI manifestó: "Nosotros no tenemos duda en cuanto a la credibilidad de los agentes. En cuanto a lo que testificaron, no tenemos duda." *Íd.*, 1:1:13:34.

[109] En atención a nuestra conclusión, consideramos innecesario pronunciarnos en cuanto al planteamiento del Procurador General en torno a la ausencia de legitimación activa del Imputado para solicitar la supresión de la evidencia ocupada al Tirador. Ello sobre la base de lo resuelto, en cuanto a la Cuarta Enmienda, *supra*, en *Rakas v. Illinois*, 439 US 128 (1978). Véanse, además, E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, Ed. Situm, 2017, págs. 257-258; E. Chiesa Aponte, *Derecho Procesal Penal*, 83 Rev. Jur. UPR 831, 857 (2014).

lo que aparentaba ser sustancias controladas, y el Imputado le entregó al Tirador una cantidad sustancial de lo que aparentaba ser marihuana. Todo lo cual fue observado por el Agente y constituye motivos fundados para los arrestos del Imputado y el Tirador, realizados inmediatamente. Fue de forma incidental a dichos arrestos que se realizaron los registros que produjeron la evidencia objeto de la Moción (dinero, en el caso del Imputado; marihuana, en el caso del Tirador).

Resaltamos que el lugar donde ocurrió la intervención policiaca es un área común de un complejo residencial, al aire libre, con muy poca o ninguna expectativa razonable de intimidad. De conformidad con el testimonio no controvertido de los agentes que participaron en el operativo, estos tenían motivos fundados para intervenir con el Imputado, el Tirador y el Otro Runner. En particular, surge inequívocamente que el Agente observó al Tirador vender las sustancias controladas que tanto el Imputado como el Otro Runner le suplieron, y que el Agente así se lo comunicó al Sargento y a los agentes que arrestaron a los implicados. Por consiguiente, nos encontramos ante una intervención gubernamental válida y razonable.

Es importante destacar que en el caso de autos el Agente utilizó unos binoculares para realizar su vigilancia. La norma es que las observaciones hechas utilizando binoculares no constituyen, *per se*, un registro irrazonable. *Pueblo v. Soto Soto,* 168 DPR 46, 64-65 (2006). Por tanto, "la utilización de estos instrumentos contribuyen a proteger la seguridad del agente que lleva la investigación y no ofenden los estándares de intimidad que nuestra sociedad estima". *Íd.*

Además, como cuestión de derecho, los elementos que el TPI utilizó para suprimir la evidencia no tenían pertinencia. Por ejemplo, el TPI aludió a que el Imputado no realizó "ningún tipo de

venta" y a que no se le ocupó alguna sustancia ilegal. No obstante, ello no es pertinente al asunto de si la evidencia debe ser suprimida. A lo sumo, sería pertinente al momento de determinar, en juicio, si el Imputado es culpable del delito imputado. Igual ocurre con la apreciación particular del TPI sobre el valor probatorio del dinero y la marihuana incautada. Por su parte, el hecho de que una bolsa ziploc, que el Agente declaró que observó, no fuese ocupada, tampoco incide de forma alguna sobre la controversia propiamente ante el TPI: si procedía suprimir la evidencia que sí se ocupó.

En fin, de conformidad con la prueba no controvertida, creída por el TPI, el Agente observó al Imputado llegar al Residencial, entregarle aparente marihuana al Tirador y ayudarle a este a contar dinero producto de la venta ilícita. Esta droga le fue ocupada al Tirador dentro de una caja transparente contenida en cilindros o capsulas y en bolsitas que coinciden con la descripción ofrecida por el Agente, y al Imputado se le ocupó dinero en efectivo. Más aún, el Imputado fue quien único le entregó marihuana al Tirador, toda vez que el Otro Runner hizo entrega de otra clase de sustancias controladas. Todo ello justificaba el arresto del Imputado y del Tirador, así como el registro incidental a dichos arrestos, por lo cual no procedía la supresión de la evidencia ocupada como consecuencia de los mismos.

V.

Por los fundamentos que anteceden, se expide el auto de *certiorari* solicitado, se revoca la *Resolución* recurrida y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de forma compatible con lo aquí expuesto y resuelto. En virtud de lo dispuesto en la Regla 211 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 211, el Tribunal de Primera Instancia puede proceder de conformidad con lo aquí resuelto, sin tener que esperar por nuestro mandato.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones